Good morning, Gerald Braden appearing on behalf of the appellant Drew Endacott. I'd like to address my comments this morning to the extrinsic evidence issue. I don't believe the government can prove beyond a reasonable doubt that there is no reasonable possibility that some of the jurors' deliberations were less than thorough and focused than they would have been had they not heard Drew Endacott's brother essentially admit that he was guilty. The government recognized this and claimed that the jury was tainted and did not object to the mistrial motion of the defense. They later reneged on that position. But I think it shows the extent to which even the government thought that the jury had been tainted. The context of the trial, I think, is important in assessing the prejudice here. And the context of the trial is pretty interesting. I didn't find any case where it had a similar factual or procedural context with respect to this issue. Over half the jurors were exposed directly to AJ2, alternate juror twos, communication with David Endacott. Can you for me just lay out the scenario? So the one juror, so the brother said, made the statement to the juror. And that juror went into the jury room and told other jurors about it. And those other jurors, I don't know how many they were, then told that juror, no, you need to tell the judge. Is that correct?  Some said you need to tell the judge. She was upset that jurors noticed that. They said you need to communicate this to the judge. And she did that. Actually, she didn't do it, my understanding is. My understanding is that she didn't do it, but somebody did. That's what I read. Well, she did communicate what he said. Well, when he was asked. But she did not go to the judge. Somebody else did, originally.  I believe she did go to the judge. I don't know specifically whether she went or somebody went. I think the important point is that six jurors, six, spoke directly to her, and she communicated to them what she had heard, basically, that he was guilty of this. She was an alternate, but she was in the jury room with them at that point? Yeah. She was an alternate. So someone told the judge. What I'm really trying to get at is the judge questioned the alternate alone, but, Ben, did he go on and question the other jurors in front of each other? No. He questioned the entire jury individually, brought them in, and just took up the whole morning before deliberations. So had you done closing? What stage of the evidence were you in? Well, this all happened on Friday morning, and the jury deliberated, I think went into deliberations at 1 o'clock or 1230. They deliberated for two hours. So this preoccupied the jury for the entire morning on the day of deliberations. Well, you might be able to infer from the statement that he was guilty, but it didn't say he was guilty. Does that make any difference? I mean, it said he was a good guy and he didn't publish. I mean, it could have meant that he was otherwise guilty, or it could have meant there was no evidence that he published, or it could have meant, I don't know, the fact that he didn't publish suggests he wasn't. Who knows what it meant. Well, I think it was really unambiguous what was said, and even the court acknowledged that it was an involuntary admission. It was highly credible. It was coming from his brother, who obviously wanted to help him. The judge noted that as well. And he said he's a good guy, he doesn't publish. Well, saying somebody doesn't publish, there's a direct rational connection between that statement and the fact that you've got these illegal images and you've got them, you've been collecting them, but you don't send them to anybody. You don't publish them. It's unequivocal in my mind. Well, I don't know. I mean, is there any evidence that any juror took it that way? I mean, the examination of the juror just says, well, he said he was a good guy and then what happened? Well, first of all, courts have acknowledged how prejudicial evidence of a prior conviction is and have reversed based on extrinsic evidence. No, I understand that. I'm just asking for the facts in this case. Is there anything in the record that would indicate that the juror, any juror took the inference that you're putting on this statement? Well, no. No, all the jurors said, oh, yeah, that won't affect me, but that's not controlling. No, no. I'm talking about the inference that he was. You're drawing the inference from the statement that it's an admission of guilt. The other conclusion is that he's saying they're trying, the brother's trying to say he's a good guy, and that's the message they took. All I'm asking is, I don't see anything in the record, but maybe you can illuminate it for me. Is there anything in the record that would indicate that the jurors thought this was an admission of guilt? I don't see how they, no, not specifically. Okay. That's all I wanted. I don't understand your other argument. I just want to see if you can help me with the record. I'm not. No, there's no definitive indication in the record that the jurors were. The case law admits of a relatively narrow harmless error role here, and the question is why isn't whatever, even assuming that, given the admonitions and given their statement that they weren't going to take it into account, and given, I think, the non-direct, at least the indirectness of the statement, why wasn't it reasonable to conclude that it wasn't going to affect the jury? Given the record as a whole in the case. In other words, I need some help with the record as a whole. Well, this was, in my mind, an admission. I'm not asking you that. Listen to the question. All right. I'm asking you for a harmless error analysis. Yeah. I was going to get that. All right. I wanted to preface my remarks with that. The jurors' indications that it wasn't going to affect them. Now, I want to know something about the record in the case other than this. All right. I want to know how the speck. All the evidence. The only issue in the case was knowledge, whether he knew. I know that, too. Okay. I want to know why there wasn't adequate, more than adequate evidence of knowledge without anything they might have inferred from this. I think that the jurors could not really evaluate the evidence with an uncolored, unprejudiced mind when they were reviewing the evidence. All right. What was the other evidence? The other evidence was circumstantial, and it had to do. It was presented by Pixley, a forensic computer expert, and he described how the images were organized on the computer, how the files were organized and labeled. And what would be a theory by which you would organize and label things as he did and not know what was in them and not know that they were pornographic, child pornography? Well, the defense position was that it was he downloaded them inadvertently or it was a virus. I understand that was their theory, but the evidence was that they were organized that somebody had moved them from however they were downloaded into files which seemed to identify them as child pornography. So the question is why isn't that dispositive enough that it didn't matter what they thought? Well, if even one juror was unable to focus on the evidence or spend as much time on the evidence that he or she would have done absent knowing that extrinsic evidence, then he's entitled to a new trial. And can we really say that the people, the jurors that walked into that room to deliberate, who had heard that he was guilty from his brother? You know, you've got two issues. One is what was the statement? And then two, how did it affect the jury? I mean, would it have made any difference anyway? What you're saying is you're basically arguing for structural error. I think what Judge Burson is asking is, look, this seems like a strong case. What's your best argument that it was a weak case? Forgetting the extrinsic evidence. My best argument? Yeah. You want me to argue for the government? No. No, your best argument for you. But so I guess I have a separate question. I'll just get there, and then maybe we can bring you back to the other question. If it's not structural error, is there, you know, is it harmless error? Okay, the closest I've found of any juror interpreting this is alternate number two. And she says that the brother said, I just wanted to tell you that he's a really good guy and he doesn't publish and everything. And that's when I was like, oh, he's involved with this too. I was like, I didn't say anything. He's like, okay, have a nice day. So to me, when she says he's involved with this too, that's saying that they're both guilty of the child porn. I mean, that's the closest I've come to a juror's interpretation of what that statement pointed to guilt. I could go and quote you what each juror said. It's in the brief what each juror said when questioned by the court. And many of them, not all of them, heard that he does not publish. He's a good guy. He's a good guy. There was two parts. He's a good guy. He does not publish. Well, then the juror also then had a somewhat contradictory rendition a couple pages later. And he, of course, does not tell me again what happened. And he says, well, he just said he was a really good guy and that pretty much make himself like he was a good guy, that he wouldn't do something to hurt other people. And that's what I told him. Well, there was that as well. I mean, by the way, there was definitely more than a couple of jurors heard that he does not publish. And he doesn't hurt people. He doesn't hurt other people. But the government was equally concerned that this was tainting. And the reason I think the government was concerned was that what you would take out of it is the part he's a good guy. I think the government was concerned about the taint because they were concerned that the jurors would take away that he's a good guy and maybe not convict. I don't think so. That's not my interpretation. All right. Can we go back to the other question, which is what is the ‑‑ if you need to explain to us why the evidence in this case was relatively weak and, therefore, something like this would matter, how would you explain that to us? It's a close call. I can't say, you know, I can't say that the evidence was really weak. On the other hand, I can't say that not one of the jurors would have walked into that jury room and felt inside their heart that this guy was guilty before the deliberations even began. Okay. Well, our questions have taken you over your time, so we'll thank you for your argument, and we'll hear from the government. Good morning, Your Honor. Wendy Wu for the United States. May it please the Court. I would like to begin by addressing or explaining the context for the statement that was made by Defendant's brother and how it was addressed by the trial judge, and also then address Your Honor's question regarding the harmless error analysis. I was trial counsel. The statement was made, this issue was raised when one of the AUSAs had observed the Defendant's brother talking to a juror outside the courtroom before trial began, and this happened on the third day of trial. The trial had already been going on for two days, and this was before the government, before the parties presented closing arguments. Once this issue was raised, the trial judge immediately summoned the alternate juror who had this encounter and found out from her what was said. Basically, her explanation was that the brother came up to her and, among other things, said, My brother's a good guy. It's not like he published or everything. So when you said to the trial judge, Your Honor, the government is concerned that the entire jury pool has been tainted, what did you mean? Well, that was my initial reaction, and I think the parties, both trial attorneys, I think the parties have been so hypersensitive to the main issue at trial, the proof of knowledge of knowing possession, that we interpreted this statement to have been perceived by the jury in the worst possible light as some sort of admission. The statement, the government believes, was ambiguous. It could have been interpreted as the Defendant had these images but didn't send them around. And there was no dispute that the Defendant possessed these images. The forensic evidence established that. The defense was that even if the Defendant had these images, it was by mistake. It could have been by a virus. It could have been inadvertently downloaded without his knowledge. So that statement was the issue. So knowledge was a key issue. And what I find the most troubling is that both you and the Court interpreted the statement as implying that the Defendant knew the pornography was there. And I'll quote the judge. He says, this is after they'd gone through and they'd asked all the jurors, you know, could you still, could you disregard the evidence. And the Court says, one of the interesting things that occurred in thinking about this as I was questioning this thing is that although I'm sure Mr. David Anikot was doing everything he could to help his brother, the fact that you make the statement that he does not publish implies that he knows it's there. And then you say, yes, Your Honor, that's our impression too. It's an admission to possession. So we would like to have a little bit of time for me to confer with other assistants and decide what would be appropriate. So you recognized and the Court recognized that what the brother had said was basically an admission that could be projected to the Defendant that he knew that he had the pornography. And that was the key issue at trial. Yes, Your Honor. That was the discussion in court. That was a concern for the judge as well as for the government. No, but it's not just the concern. It's the interpretation of the statement. I mean, to me, when I first read it, it's a little ambiguous. It could maybe be saying the guy's a good guy. But if the court at the time decides it's a statement on a key issue of the case, should we really be deferring to the courts then finding that the jurors could just disregard that statement and decide the case? Well, I think in light of how the judge handled the questioning of the jurors, this discussion was we began the discussion before the judge questioned the jurors individually and after. And everyone in the courtroom, including the judge, pretty much assumed the worst, that this was going to be taken as some involuntary admission by Defendant's brother. But once the jurors responded individually to the judge's careful questioning, it was clear that nobody was focused on that issue. There was nothing in the record to show that there's any discussion on any of that. But the colloquy I just read occurred after the jurors were questioned. Yes. I mean, when you say that's our impression, too, what did you mean? At the time, that was still my belief because I still was very sensitive to this issue. But then further you actually said, or what somebody actually said, was that he was admitting to possession. Now, I guess possession could be possession in a legal sense, or it could be possession meaning he had them, which is everybody agreed he had them. The statement, my interpretation, which is one of the interpretations, was that at most it was an admission to possession, but the issue was knowing possession. Right. And there was no reference to that. Even if we were to assume that that was the admission, it does not contradict the defense's position, which is that he could have possessed it, but he didn't know he had it. No, but this is what the judge said. This is a passage that Judge Wardlaw read to you. And this is the judge that says, I was questioning and listening, and that I'm not sure Mr. David Endicott was doing everything he could to help his brother. And this is the key phrase. The fact that you make the statement that he does not publish implies he knows it's there. And you say, yes, Your Honor, that's our impression, too. Yes. So that goes to knowledge. At least you thought it went to knowledge at that point. We did, but then according to the Just clarify for me. Knowledge was something you had to prove. Yes, Your Honor. We had to prove the defendant knew that real children were used in producing these images and that the images, and he knew the images with the real children involved sexually, depicted children engaging in sexually explicit conduct. So we did have to prove knowledge. Assuming for now that that was at least a fair enough implication that one should worry about it, what is the harmless error standard and how does it apply here? The – on this issue, the government's position that there's no reasonable possibility that the defendant's statements affected the verdict, that is equivalent to the harmless error standard. And the evidence at trial was not circumstantial. It was very strong against the defendant. But you must – you have to prove that. The standard is whether there is a reasonable possibility that the extrinsic material could have affected the verdict. Yes. And – but you must – the burden's on the prosecution to prove beyond a reasonable doubt that it did not. Yes.  And I would just – I would just summarize. The evidence – Is the standard beyond a reasonable doubt or is that what no reasonable possibility means? I'm just not sure. The crime case. It's the – on the extrinsic evidence issue, the government – the standard is that there a new trial would be – would be granted if there is some reasonable possibility that the extrinsic evidence or information could have affected the verdict. Is this equivalent to a Chapman standard? I'm just trying to understand what the standard is. This was under Prime. I know that. I'm asking you what it means. It – it is equivalent to harmless error. That's the standard. To constitutional harmless error. Yes. So it's a beyond a reasonable doubt standard. It is beyond a reasonable doubt. And that was the – that was the standard the government did establish at trial. Wait a second. So – so this – really, the question – Judge Burson is doing the right thing, fleshing out this – the prosecution's burden. Because the – Prime says the prosecution bears the burden of proving beyond a reasonable doubt that the extrinsic evidence did not contribute to the verdict. Yes. So you have to show that it didn't play any role in the verdict. Did you ever show that? Yes. Okay. I believe we did. And also in Keating, the court clarified that the government has the burden. In order to show that the extrinsic evidence did not contribute to the verdict, the government still obviously has the burden to prove beyond a reasonable doubt that the verdict was not affected by this information. And the evidence I submit that was presented at trial by the government was very strong. Just to quickly summarize, the evidence showed that the defendant did transport these images, thousands of them, on his computer into the United States. That's when he was encountered by CBP. And the forensic evidence showed that the defendant, in addition to surfing the Internet for these images, collected, downloaded, and organized these images. And one very important piece of evidence was how the defendant organized these images. He was very meticulous. He also went as far as to rename the folders in which he saved the images to reflect the content of the images, bad girls or bottoms. So that clearly showed that he touched these images. And also, very importantly, the evidence showed that the defendant had backed up these images onto external hard drives. I thought his main argument was that they were on a zip drive that had never been opened. That was contradicted by the forensic evidence in this case. It showed that he did access these images. And also, he backed up these images into a hard drive shortly before he came into the last access, actually. Well, you could back up an entire file and not know what was on it. But I thought that the – I thought, and I could be wrong, that the evidence wasn't so much that it was – that there was proof that it was accessed as that – that it was opened up, without opening it up or something like that. One could access something on a zip drive that hadn't actually been opened. I don't understand that. That is a possibility. But the forensic expert was able to show that the way the defendant went about seeking these images from the websites that he admitted to surfing, he would have to have seen a thumbnail of these images to select and download. He could not have just – it wouldn't have been dumped on his computer without his knowledge. He specifically would have had to see on the computer screen what the images were, at least a thumbnail view, select them, and then arrange to have it saved onto a specific folder on his computer. All of that was proven forensically. And – So when the defense lawyer got up in closing argument and repeated that this was a zip drive that had never been opened, it was just contrary to the record? Yes. It was contrary to the record. And the defense position was also that – there were a couple of theories, that it could have also been due to a virus. It could also have been contaminated by the ICE agent who seized the computer. And none of that was true. So with this evidence – How did you prove that none of that was true? I'm sorry? How did you prove at trial that none of that was true? Well, the forensic expert did show that – did – and it's – and there are two forensic examinations that were conducted, one by the ICE forensic agent and one by a privately retained expert. And both had also, in their analysis, looked for any kind of malware to show that there was virus on the computer, and there was not. There was no indication that there was any kind of a hacking, any kind of intrusion, that allowed these images to get onto the defendant's computer without his knowledge. If anything, it showed that he was very deliberate in his collecting these images. And also – But the defense lawyer said in closing argument that zip file was never opened, it was never decompressed, and claims that that was based on Pixley. And that's just wrong? That – that was incorrect. That was incorrect. Pixley did demonstrate, because he was able to re – I'm sorry. I believe my time has been up. Go ahead and answer the question. Pixley was able to – he explained very methodically how he went about determining that how the defendant must have necessarily seen these images as he was accessing these websites that defendant admitted to accessing. And the way he did it would require these images to show up initially on that screen, and then he would have to have seen it and decided he wanted these and then download them. That was the forensic evidence of trial. Any further questions? Go ahead. What if the jury didn't believe Pixley? I mean, I have – I am – I have not – don't have very much computer literacy, but sometimes things show up on my computer, and I don't know who they're from. They're from, like, a slightly different type of name, semi-familiar. And if you open them, it's most – you know, awful stuff. And I'm just thinking, how do I get that? You know, how did it come to my spam? But the counterargument to that is this happens to me, like, maybe two or three times in a – in a month. And he had 400 to 500 of those, so the likelihood is that he had to know, is that the sheer number? Is that how you counter that argument? That certainly is a factor. It's a very important factor. The – based on the forensic examination, the agents found 17,000. And so for this to happen thousands of times, even before we get to collecting the organizing, that's just – that's just – that's just very unrealistic. But even without the forensic expert's testimony, if the jury were to throw that out, there's additional evidence that the defendant had sought out these images. In the journal entries that were admitted, the defendant – the two entries that the court allowed under 404B and 403, the defendant chronicled or wrote in the journal that he was looking for, quote, teen content and also, quote, Japanese illegal sex sites. That is not to show that he obviously had the propensity to collect the CP images, but it certainly showed that he – the jury could have inferred that he had the intention, that he had the opportunity as he was surfing the Internet for these images. And so that was also very strong, we believe, evidence of defendant's conduct and his – the deliberate action in collecting child pornography in this case. Okay. Thank you very much for your argument. I'll give you a minute for a follow-up. Thank you, Your Honor. I just want to clear up one point, which is Endicott stipulated to every element of the crime except the knowledge of whether the images were on his computer. He stipulated to the fact that they were transported in foreign commerce, depicted real children, were produced using – Was there, in fact, evidence and how was it refuted that the only way he could have gotten there is if he had seen thumbnails and chosen it? Could you repeat that, please? Was there, in fact, evidence that in order for the images to have gotten there, he would have had to look at thumbnails and choose these images? And if that's – if there was such evidence, was it refuted? I think the evidence was open to interpretation, and it was ambiguous. That's not helpful. I think that with the – I also would like to point out – Was there such evidence? Is that what the expert said, that he couldn't have done it accidentally because he would have had to choose individual images from thumbnails? Is that what the expert said? I believe it was. All right. Was there a counter to that? Was there a defense to it? Did you put on any – other expert or anybody else who said that that isn't true? No. There was not. I just wanted to make one other point. Because knowledge was the only issue to be litigated at trial, can we really say that not one juror – there was no possibility that the extremistic evidence didn't affect one juror? If he actually chose it and there was nothing to counter that, then I don't see how any juror could have thought otherwise. Well, how could a juror – how could these jurors have deliberated going into the jury room knowing that he was guilty, that the brother said he was guilty? Right. You've made that point before, so. I'm sorry. So you let this expert witness testify that the only way he could have the images in the way they are was he had to have known. He had to – and did you – did your client testify at trial? No. And did you just – you didn't put on a counter expert? I don't think so, no. But he did question the government's expert, and the defense was that there are bots and viruses and all kinds of things that can invade a computer that can result in, as you described yourself – And he got that in through their expert? I'm sorry?  The question is, did the trial judge get that kind of evidence in through the government's expert? Or how did you get that evidence in? Well, he argued that. Well, he argued that. He just argued that based on his cross-examination, said bots can exist, yes. And the expert said they aren't on this computer. So that's just argument, isn't it? Well, it is argument, yes. Yeah. I mean, there was no affirmative evidence that the defense put on saying, yeah, there's a virus here, there's a bot here, there's something on this computer that would – Well, that's where this whole issue of forensic computer technology comes in, which is a pretty complicated, obscure thing in many ways. And I think that it's not definitive. I mean, things happen to my computer, and I'm sure everybody in the room has had situations happen with their computer in which they just don't understand how one thing or another – Right. Now, I get that, but I'm just asking for what the evidence was in the case. And as I understand the record, the only defense was made during the cross-examination of the government's expert. There wasn't any affirmative expert, any affirmative proof put on about the computer, right? No. I don't think there was anybody that said, well, I could identify a bot. I think we have an end. Any further questions? All right. Thank you both for your arguments. Yeah. Just one other thing. There was some discussion about what each juror said and what each juror – I've got the record, and we've seen that. Okay. That's in the – Thank you very much. We do have a good summary of what each juror said, so I assure you that we'll take that into consideration. Thank you. Thank you both for your arguments.
judges: Thomas, Wardlaw, Berzon